In re **HILLSBOROUGH HOLDINGS CORPORATION, et al., Debtors.**

In re **JIM WALTER RESOURCES, INC., Debtor.**

Bankruptcy Nos. 89–9715–8PI to 89–9746–8PI and 89–9738–8PI.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Nov. 24, 1995.

Don M. Stichter, Tampa, Florida, Michael Crames, New York City, Conrad P. Armbrecht, III, Mobile, Alabama, for Debtors.

George Gordon, Stanley Murphy, Tuscaloosa, Alabama, for University of Alabama.

Marc Kirschner, New York City, for Creditor's Committee.

Daniel Golden, New York City, for Bondholder's Committee.

## ORDER ON OBJECTION OF THE CLAIMS OF THE UNIVERSITY OF ALABAMA

ALEXANDER L. PASKAY, Chief Judge.

Among the several wholly owned subsidiaries of Hillsborough Holdings, Inc./Walter Industries ("HHC"), with possible exception, none has been involved in more serious and important litigations than Jim Walter Resources Inc. ("JWR"). Although the Joint Plan of Reorganization of HHC, its subsidiaries, and the Official Committees has been confirmed, the Plans expressly provided for the retention of jurisdiction to consider all objections to the allowance of claims filed against any of the Debtors involved in these Chapter 11 cases.

The immediate matter under consideration is an Objection by JWR to the claims filed by the University of Alabama ("University"). The original claims have been orally amended by the University and it is without dispute that the claims under consideration are the following: (1) an unsecured claim in the amount of $712,327.00 based on coal royalty allegedly due to the University on coal not mined but should have been mined and; (2) the sum of $170,340.98 for underpayment of coal royalty due to a miscalculation of the "F.O.B. mine" selling price.

JWR, in addition to challenging the allocability of these two claims, filed its own claim against the University in the amount of $50,-695.10 based on alleged prior overpayment mistakenly made to the University. Because the claims of the University and the claim of JWR involved different factual basis, the parties agreed to try them separately and requested to have them considered accordingly. The facts relevant to both claims of the University as established at the final evidentiary hearing can be summarized as follows:

### CLAIM FOR ROYALTY FOR THE UNMINED COAL

On June 26, 1974, the University granted to United States Pipe and Foundry company a coal mining lease covering certain real property, owned by the University, located in Tuscaloosa and Jefferson Counties, Alabama. (Debtor's Exh. # 32) Part of the property covered by the Coal Lease is 560 acres of land which comprises all of Section 6 (except N2/NW), T19S, R5W ("University Tract"). The unmined coal involved in this claim of the University is 42 acres located in the northeast corner of the University Tract. (Debtor's Exh. # 1) This disputed area is marked red on the Exhibit. The Exhibit also depicts an additional triangular strip in the northeast corner which also has not been mined although it is covered by the Coal Lease. It is conceded by the University that this strip cannot be mined economically, thus, there is no claim asserted by the University for royalty payment relating to the unmined coal under this tract.

At the time the Coal Lease was executed, which was later assigned to JWR, all underground mining by JWR was the "room and pillar" type mining. Under this method of mining the coal was removed from interconnecting tunnels beneath the surface either by blasting (conventional mining) or by use of a machine referred to in the industry as a "continuous miner". In deep mines such as the ones operated by JWR, this type of mining produced only 30% of the coal available for mining underneath the property being mined. In order to explore the possibility of increased production JWR consulted in 1976 with the mining consulting firm of Paul

Weir & Co. (later renamed Weir International Mining Consultants). The Firm after having conducted a study recommended that JWR change its method of mining from the "room and pillar method" to longwall mining method.

Longwall mining is a fairly recently developed method and at the time of the Weir study was not well known in the United States. Under this method a large area can be mined by one machine. The continuous miners which are relatively small machines cut out tunnels, sometimes called "entries" or "roadways" in the underground coal seams which in turn creates a large panel or block of coal that is 6 feet tall, 700 feet in width and 5,000 feet in length. After the roadways are cut out around the panel, a longwall machine called a shearer is set up across the width of the panel of coal. This machine has two cutters which run across the 700 feet face of the longwall panel, cutting out the coal, which is then carried out by a conveyor belt that runs underneath the machine. On the top of the machine a shield is installed which provides roof support for the miners and the equipment. (See Debtor's Exh. # 6) As the longwall machine cuts into the panel of coal it moves forward along the length of the panel and the shield with it, leaving behind a cavity in the earth with no roof support. As a result of the weight of the coal and rock overlying the cavity, the roof collapses and breaks down into a mass of smaller pieces called the "gob".

The longwall mining method has been recognized to have decided advantages in deep mines primarily because the recovery under this method is typically 50 to 60% as distinguished from the 30% recovery which is the norm in the room and pillar type mining. While it is true that even under this method a substantial portion of the coal cannot be recovered, the loss of coal is unavoidable and under the present state of art the result produced by longwall mining is the best one can expect. However, it should be pointed out that longwall mining is extremely expensive. For instance, the longwall mining equipment described earlier, is composed of a shearer, shields and a conveyor belt, runs as high as $20 million. Moreover, unless the machinery is utilized, constantly operating, such an expensive machine is not economically feasible.

There is another problem with the longwall mining. In order to operate the machinery in an economical fashion, the longwall panels must be the shape of rectangles and must be laid out in a series so that panels can be developed in sequence, one after the other, with the development of entries sometimes referred to as tunnels which are shared among the panels in the series. In essence, this method is not suitable for small or irregular shaped or isolated pieces of properties.

An unavoidable byproduct of coal mining has been traditionally the methane gas which is, of course, dangerous because it might cause asphyxiation in addition to being highly explosive. In order to dilute and remove the methane gas, operators of deep mines including JWR use large fans in order the circulate vast quantities of air through the mines. The fans used are the largest such fans used in the United States. They are designed to pull the air down into the intake shaft, through the roadways or tunnels across the active mining face of the longwall panel and then back out through the tunnels behind the longwall panel. These are called "bleeders." The air is exhausted through fan shafts to the surface. Federal law requires not only that these fans are kept in constant operation but also that the bleeders for each longwall panel be kept open during the entire time the panel is being mined.

## OPERATION OF THE UNIVERSITY TRACT

JWR began its mining of University Tract during the first half of 1983. (Debtor's Exh. # 1) Over the next 9 years, parts of five separate longwall panels and related development entries were mined underneath the University Tract. These operations paid to the University as royalties in excess of $11 million based on the coal mined. While this operation produced approximately 50% of the total coal underlying the entire University Tract which, of course, was in excess of what was produced through the room and pillar type of mining, it was only achieved by overcoming some unusual and difficult hurdles.

In about 1986, when mining the east/west tunnels at the southern end of what later became F panel, JWR encountered a faulted, disturbed zone. Prior to running into this disturbed zone JWR was not aware of its existence and although repeated core hole drillings were utilized to test the ground, this type of geological feature was not readily detectable. Initially this disturbed zone was not expected to present a major problem since in the past similar disturbed zones had been encountered. As mining progressed between the entries of F and G panels this disturbed zone got worse and ultimately made it impossible to continue mining in the entries. Attempts to bypass the disturbed zone and to continue to mine were not very successful and because the entries for the F panel were west of the disturbed zone, which extended through the entire length of F panel, these entries could not be used to mine G panel as was originally planned. In addition, there were unsteady roof conditions present in the disturbed zone that rendered the mining of the G panel dangerous. Further plans were made to overcome this obstacle and to mine the G panel. Such additional exploratory work was conducted to further define the direction and the extent of the faults which were bordering the G panel. After completing this additional work JWR came up with a new design for G panel which they believed would permit mining of the G panel.

One of the changes recommended was to change the layout of the G panel so that two sets of entries would be driven for G panel, one on each side, rather than only one set. This new design was more expensive and time consuming to implement. This modification and the redesign of G panel permitted JWR to mine additional significant amount of coal. Safety considerations and timing/economic considerations prohibited extending the G panel up to the disputed area.

## SAFETY CONSIDERATIONS

The safety considerations primarily related to the ability to keep the bleeders of G panel open if the panel was extended to the north. In order to extend the G panel to the north it would have required JWR to employ what is known in the industry as "internal bleeders."

It appeared to be doubtful that the mine safety hazard agency of the Federal Government, MSHA, would have approved the use of internal bleeders because of the likelihood that the roadways would collapse as the mining proceeded. Furthermore, if JWR attempted to utilize the internal bleeders, it appeared likely that the interconnecting bleeders between the F and G panels (see inset B on Debtors' Exh. # 3) would have collapsed before G panel was completed because of the stress that would have been placed on them when the longwall mining operating passed. There is testimony in this record to establish that extending the G panel into the disputed area would have created unacceptable risk not only for JWR and its miners but also for the University. It appears that even with the limited stress placed on the bleeders, through the operation actually conducted, they began to experience severe deterioration before mining on G panel was completed. During the last two months of mining on G panel, MSHA required that JWR maintain continuous 24 hour inspection of that area as a precondition to continue the mining of the G panel. In addition, several other problems were encountered toward the end of the mining operation of the G panel. Flooding and cave-ins in the headgate and tailgate area were so severe that the panel could not be completed and some of the mining equipment had to be abandoned.

## TIMING/ECONOMIC CONSIDERATIONS

In addition to safety concerns, economic considerations also made it impractical to extend G panel northward into the disputed area. As noted earlier, due to the fact that the longwall mining equipment is extremely expensive the equipment must be kept in almost constant operation to make the mining through this method economically feasible. JWR plans its mining operations 5 to 10 years in advance. Obviously, the ten year plan is very general and non-specific and the five year plan is more, and in fact very, detailed. The five year plan is reviewed every three months as the mining progresses so adjustments can be made as required by changed or unknown underground conditions. Additionally, JWR was constantly re-

viewing satellite photographs, conducting seismic tests, and drilling core holes at the cost of $100,000.00, even before the mining commenced, in order to make sure there were not geological problems which would either impede, inhibit or obstruct the proposed mining operation. A total of six or seven core holes were drilled in conjunction with the planned mining of the G panel. Notwithstanding, even with this extensive pre-testing it did not become evident until later, that due to the fault, there existed a disturbed zone and certainly there was not prior evidence of the magnitude of this disturbed zone. After discovering this problem, JWR revised its five year mining plan and even though the inherent risk involved in this proposed mining, laid out a double drivage panel to be mined between the disturbed zone and the large fault to the east. Generally speaking, mining continued through two shifts per day and the third shift was reserved for equipment maintenance. In the present instance, G panel was mined in three shifts, that is around the clock, in an effort to expedite the mining of the panel and to compensate for delays which were expected to be caused by the geological features encountered in and around the F and G panels. It became evident that moving the start up point for the G panel further to the north would have been impractical even if the above discussed safety consideration could have been overcome. It appears that moving the start up point to the north, thus extending the G panel, would have resulted in a delay of at least 93 work days or almost five calendar months which would have cost JWR approximately $18 million.

In sum, it appears that because of the safety considerations and the unexpected and undiscoverable geological conditions, it would not have been economically sound to extend the G panel up north and attempt to mine the disturbed zone. This leaves for consideration whether or not the coal in the disturbed zone is lost completely and cannot be economically mined or that it has no value because it is unmineable or "bypassed coal" as used in the parlance of mining. The area is not isolated from any potential mining operation in the future and on the contrary is accessible from the north and therefore the coal in the disturbed zone could be mineable in the future.

## MINING PROJECTIONS REQUIRED TO BE PROVIDED TO THE UNIVERSITY

Section 11 of the coal lease provides that:

In advance of any actual mining on property of Lessor, Lessee shall submit to Lessor suitable detailed projections showing the contemplated advance of all workings. Lessor shall have thirty (30) days after receipt of such projections within which to raise objections based on the ground that such workings, if projections, will constitute imprudent or unworkmanlike mining operations; and any matters not objected to in writing, delivered by Lessor to Lessee within such thirty (30) day period, shall be deemed to have been approved by Lessor. . . .

Under the coal lease, the University has 30 days after receipt to object to the proposed operations but in absence of an objection the proposal is deemed to have been approved by the university. The lease further requires that at least every six months that mining operations are being conducted, JWR must furnish the University with a map showing where the operation is being conducted. Pursuant to the requirements of section 8 and 11 of the coal lease, JWR provided the University "Progress Maps" every six months. and with the five year plan maps annually. The progress maps were intended to inform the University where the mining is taking place and also where the mining is going to take place in the future. The purpose of the five year map plans is also identical.

It is without dispute that the maps furnished to the University beginning in 1988, clearly showed that no mining was contemplated in the disputed area. For instance, the five year plan for 1988–1993 (Deb exh. 11) clearly indicated that the G panel would not extend into the disputed area, that G panel would begin south of the disputed area, and that no mining would be conducted in the disputed area. In addition, progress maps submitted to the University (Deb. ex.

26) which covered the period of January to June in 1989, set forth precise projections for the layout of the G panel, and just like the five year plans, clearly showed that the G panel was not to extend into the disputed area. There is no evidence in this record to warrant the finding that the University did at any time prior to August 19, 1991, interpose an objection either orally or in writing to the proposed layout of the G panel. Despite the fact that the maps furnished to the University during 1988, 1989, and 1990, clearly indicated that Jim Walter Resources did not contemplate and intend to mine in the disputed area by extending the G panel north, it was not until August 1991, after the commencement of the Chapter 11 case, before the University voiced an objection to the mining plan as depicted by the maps discussed earlier.

■ Basically these are the facts established at trial, based on which the claims as set forth in the Debtor's Objection to the claims filed by the University must be evaluated. The University has filed a unsecured claim in the amount of $712,327.00 as a royalty payment for unmined coal. The burden of proof is upon the University to prove is claim by a preponderance of the evidence. Basically there are two claims alleged by the University.

First, it is alleged that JWR was negligent, imprudent or guilty of faulty practices when it adopted and implemented a mining plan that located the longwall start-up point for G panel south of the disputed area. In mining panel F and G, JWR was faced with unforeseen geological disturbances. Based upon expert testimony presented at trial, JWR followed the best possible alternative by placing the start-up point for panel G south of the disputed area. The decision to place the start-up point there is justified because it would have been an imprudent decision for JWR to continue into the disturbed area based upon the safety considerations involved and the fact that the longwall mining machine must be constantly running in order to prevent millions of dollars of loss due to idle time. This Court is convinced any mining business confronted with the same geo-

logical situation would have taken the same approach.

Secondly, the University claims that by changing the start-up point for panel G to the south of the disturbed area, the coal remaining in the 42 acres at the northeast corner of the University Tract is rendered unmineable. There is no believable evidence before this Court that the coal located in this area is unmineable. Obviously, the coal is not reachable from the original approach but the facts show that the coal could be mined by someone else by approaching it from another direction, such as from the adjoining property to the north, and thus this Court is not convinced the coal is unmineable.

Based on the foregoing, this Court is convinced that the University has not met it's burden of proof, and therefore, JWR's objection to the portion of the University's claim involving royalties claimed for coal still in the ground, is sustained.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Objection by JWR to the claim of the University of Alabama as it relates to the coal royalties be, and the same is hereby sustained and that portion of the claim be, and the same is hereby, disallowed. A separate order will be entered on the portions of the claim arising from the underpayment of royalties due to the calculation of the F.O.B. selling price and the counterclaim asserted by JWR to recover overpayments made to the University.